## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CORY THOMPSON,<br>on behalf of Plaintiff and the class<br>members described herein, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY CHAO;<br>FIRST LOAN;<br>UNKNOWN ACH PROCESSOR;<br>and JOHN DOES 1-10; | ) ) ) ) | DEMAND FOR TRIAL BY JURY |
| | ) | |
| Defendants. | ) | |

## COMPLAINT – CLASS ACTION

1.      Plaintiff, Cory Thompson, brings this action against Defendants Stanley Chao ("Chao"), First Loan, Unknown ACH Processor and John Does 1-10 to secure redress for usurious and illegal loans (such as Exhibit A) made to Indiana residents.

2.      Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and treble damages under RICO (Count II).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. §1331, 18 U.S.C. §1964, 28 U.S.C. §1337, and 28 U.S.C. §1367. Jurisdiction may also exist under 28 U.S.C. §1332(d).

4.      This Court has personal jurisdiction over each Defendant because they knowingly participated in the making of unlawful loans to Indiana residents.

5.      Venue is proper because acts to collect the loans impacted Plaintiff in the Southern District of Indiana.

6.      As set forth below, Defendants operate an interactive website, www.FirstLoan.com, through which they sought to and did make loans to Indiana residents. The use of an interactive website which permits Indiana residents (but not residents of specified other states) to apply for

loans, along with the making and collecting of loans within the state, establishes a purposeful availment of Indiana and is sufficient to establish personal jurisdiction over the defendants responsible for the site. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

## PARTIES

### Plaintiff

7.      Plaintiff Cory Thompson is a natural person who at all times relevant has resided in Indianapolis, Indiana.

### Defendant First Loan

8.       First Loan is either:

a.       An entity of unknown organization which issues loans through the website FirstLoan.com.

b.       A fictitious name utilized by Defendant Chao.

9.      First Loan uses the addresses:

a.       PO Box 1536, Lower Lake, CA 95457, and

b.       16170 Main Street, Suite 1, Lower Lake, CA 95457.

10.      First Loan, via the website FirstLoan.com, offers loans at annual percentage rates of 700% and higher.

11.       First Loan currently claims to be "a Native American-owned business operated by the Elem Indian Colony of Pomo Indians" (Exhibit A, second page) and "a subsidiary of EIC Enterprises, a wholly-owned arm and instrumentality of the Elem Indian Colony of Pomo Indians, a federally-recognized Indian tribe" (Exhibit A, sixth page).

12.      Previously, First Loan claimed to be owned by the Kashia Tribe, an unrelated small Native American tribe which purported to own over twenty internet lenders.

13.      First Loan's web server's IP address is 52.43.81.11, which corresponds to a physical location in Oregon, more than 1,000 miles from the Elem Tribe's reservation. (Exhibit B)

14.      Many of the First Loan loans are made to Indiana residents, including Plaintiff.

15.     These residents have received funds via ACH transfers into bank accounts located in Kevin. The loans also provide for repayment via ACH transfers.

16.     First Loan nevertheless advertises and makes loans to Indiana residents at rates greatly exceeding the maximum permitted.

17.     At the time of the loan at issue, First Loan's website stated that it would not make loans to residents of Arkansas, Connecticut, Florida, Georgia, Maine, Maryland, Massachusetts, Minnesota, New York, North Carolina, Pennsylvania, Vermont, Virginia, and West Virginia. (Exhibit C, p. 3) Illinois was added to the list in 2022 (Exhibit D) after an Illinois resident sued for making a usurious loan.

18.     The reason why First Loan does not lend to persons in the listed states is because state authorities or private parties in those jurisdictions aggressively enforce usury laws.

19.     First Loan thus affirmatively sought out Indiana residents for such loans at the relevant time.

20.     All loans made by First Loan were made at an annual percentage rate exceeding the maximum which may be charged to an Indiana resident.

**Defendant Chao**

21.     Defendant Chao is a natural person who may be found at 10443 Los Feliz Dr., Orlando, FL 32836 or 4700 Millenia Blvd., #270, Orlando, FL 32839.

22.     Chao is the beneficial owner of many online lending websites. He operates, and is the beneficial owner of, FirstLoan.com.

23.     On information and belief, Chao has near-total control over the First Loan lending business.

24.     At no time has Chao or any of his websites or entities held any type of consumer lending license from the Indiana Department of Financial Institutions.

25.     At no time has Chao or any of his websites or entities held a bank or credit union charter.

26.     Some collections of these loans are conducted under the name of Apex Servicing.

## Defendant Unknown ACH Processor

27.     Defendant Unknown ACH Processor the person or entity who, at all times relevant, processed the Automated Clearing House ("ACH") payment transactions for First Loan.

28.     Plaintiff believes he can ascertain the identity of Unknown ACH Processor since it uses a unique Prearranged Payment and Deposit Identification number ("PPD ID"), which Plaintiff should uncover in discovery.

## Defendants John Does 1-10

29.     Defendants John Does 1-10 are other persons and entities that participated in the lending activities described herein.

## FACTS

## Defendants' Lending Operations

30.     Defendant Chao is a businessman who has owned and controlled a number of high-interest online loan websites, including FirstLoan.com. Others are InboxLoan.com and CometLoans.com, which are no longer originating loans.

31.     All of these websites purported to be owned and operated by tiny, remote, economically impoverished Native American tribes.

32.     For example, CometLoans.com was purportedly owned by the Tonto Apache Tribe, a tribe in rural Payson, Arizona, about 95 miles northeast of Phoenix. The Tonto Apache Tribe has 110 enrolled members and an 85-acre reservation, the smallest of any Native American reservation in Arizona. Due to its small size, lack of natural resources, and remote location, the Tonto Apache Tribe has struggled economically.

33.     First Loan is purportedly owned and operated by the Elem Indian Colony of Pomo Indians (the "Elem Tribe").

34.     The Elem Tribe is a group of Pomo Indians based near Clearlake, California.

35.     The Elem Tribe has marginal economic activities due to its small size, remote

-4-

location, and lack of natural resources.

36.     Despite claims that the Elem Tribe owns First Loan, the true beneficial owners are Chao, his companies, and his non-tribal investors.

37.     Chao, his companies, and his non-tribal investors manage, underwrite, collect, and profit from the lending operation.

38.     Chao takes advantage of these tribes' desperation by offering to pay them modest amounts in exchange for their claiming ownership of his illegal payday lending operations, enabling Chao to assert that the loans are being made by the tribes themselves.

39.     On information and belief, the Elem Tribe receives less than 2% of loan revenues for being the straw owner of the website and, more importantly, providing a veil of sovereign immunity.

40.     Such arrangements are referred to as "rent-a-tribe" schemes.

41.     Through such schemes, non-tribal payday lenders such as Chao attempt to avoid the restrictions of state and federal laws which would otherwise prohibit usurious loans. They do this by issuing loans in the name of a Native American tribal business entity that purports to be shielded from state and federal law via tribal sovereign immunity.

42.     In reality, the tribal lending entity is a mere "front" for an illegal lending scheme. All substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for the use of the tribe's name, those operating the payday lending scheme pay the cooperating tribe a fraction of the revenues generated, almost always in the single digits.

43.     Chao also owns a number of other entities that are related to "tribal" lending, including:

        a.      ARB Call Facilities, Inc., which provides call center services for Chao's payday lenders and other entities, with call centers in Costa Rica, the Philippines, Egypt and other

locations. Chao has held himself out as President of ARB. (Exhibit E, p. 3 of 6)

        b.     Sabre Analysis, LLC, which claims to be a "portfolio servicing company specializing" in "Data Analytics, Lead Purchase Strategy, Collections Strategies (and) Reporting."

        c.     Apex Servicing, which is either (i) an entity of unknown organization which collects loans issued by First Loan and other payday lending websites beneficially owned by Chao, or (ii) a fictitious name under which Chao collects the loans issued by First Loan.  Apex Servicing has a website (https://www.apexservicing.com/), on which it lists addresses of (i) PO Box 637, 333 South Main Street, Blanding, Utah 84511 and (ii) #1 Wakpamni Lake Housing, Batesland, South Dakota 57716, which is located on the Oglala Sioux Reservation.  The premises at 333 South Main Street, Blanding, Utah 84511 appear to contain a pottery shop called Cedar Mesa Pottery, a CPA office and a tax preparation office.  Apex Servicing claims on its website that it "is a Tribal licensed third-party servicer. Apex Servicing is a Native American owned business operated by Wakpamni Lake Community Corporation an Oglala Sioux Tribe of the Pine Ridge Indian Reservation, a federally recognized and sovereign nation located in the United States. Apex Servicing abides by all applicable federal laws and regulations and tribal law as established by the Oglala Sioux Tribe of the Pine Ridge Indian Reservation."

## **Sovereign Immunity as a Defense to State Usury Laws**

      44.     An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

      45.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the

entities." *Breakthrough* at 1183, 1187-88.

46.     An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity.  *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

47.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

48.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

49.     The fact that First Loan was not started by the Elem Tribe but was an existing business that was purportedly absorbed by the Elem Tribe indicates that there is no sovereign immunity.  *Williams v. Big Picture Loans, LLC*, 329 F.Supp.3d 248, 272 (E.D.Va. 2018) ("the tribe was not starting an independent lending operation but rather facilitating the absorption of Red Rock's fully functioning lending enterprise").

50.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

51.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United*

*States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

### Defendants' Loans

52.     First Loan makes loans through its website, FirstLoan.com, to consumers at interest rates in excess of 700% annually. (Exhibit C)

53.      Per First Loan's website, a $500 loan results in repayment of $3,887.82 if paid bi-weekly for a year. The total interest charged would be $3,387.82, which according to First Loan, equates to an annual percentage rate of 777.83%.

54.     The loans are collected under the name of Apex Servicing (Exhibits F-G).

55.     On information and belief, Apex Servicing only services loans issued by Chao's network of online lenders.

### Loan to Plaintiff

56.     On September 24-27, 2021, "First Loan" made a loan to Plaintiff Cory Thompson at a disclosed annual percentage rate of 769.32%. (Exhibit A)

57.     The loan agreement is a standard form.

58.     The loan was made for personal purposes and not for business purposes.

59.     The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

60.     The loan was made entirely via Internet.

61.     Unknown ACH Processor processed the transaction.

62.     The loan was to be repaid via ACH.

63.     Plaintiff made payments, including interest.

64.     First Loan's lending does not actually occur on the Tribe's reservation.

65.     A significant majority of the transaction occurs within the State of Indiana  – applying for the loan and receiving and collecting the funds.

66.     The place where a consumer is located when he or she submits an application via an

online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

67.     Plaintiff has never set foot on the Elem Tribe's land in California.

68.     Loans to Indiana residents made in the same manner as the loan to Plaintiff are governed by the laws of the State of Indiana.

69.     Defendant Chao is responsible for orchestrating the lending scheme pursuant to which First Loan lent money to Plaintiff and other Indiana residents.

70.     Unknown ACH Processor was paid for its role in processing ACH payments relating to the loans.

## Indiana Regulation of Lending

71.     The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

72.     Ind. Code §24-4.5-3-201, dealing with loans other than supervised loans, provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

73.     With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code §24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

(a) the total of:

> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

74.     There is also a provision for small loans, Ind. Code  § 24-4.5-7-101 et seq., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

75.     The amount of finance charge provided for in Exhibit A greatly exceeds that permitted in Indiana on either unsupervised or supervised loans.

76.     Ind. Code §24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

> (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

-10-

(f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

77.     Ind. Code §24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .(3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that***

-11-

*person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.* No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award *reasonable attorney's fees* incurred by the debtor. . . .   (Emphasis added)

78.     Defendants' violation was intentional. Defendants were warned in 2019 by the State of Washington that they were violating state usury laws. (Exhibits H-I)

## COUNT I  – INDIANA UNIFORM CONSUMER CREDIT CODE

79.     Plaintiff incorporates paragraphs 1-78.

80.     Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff is entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

81.     Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

82.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "First Loan" at more than 36% interest (all of its loans qualify) (c) on or after a date two years prior to the filing of this action.

83.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

84.     The class is so numerous that joinder of all members is not practicable. On

information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

85.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

86.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

87.    Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

88.    A class action is superior for the fair and efficient adjudication of this matter, in that:

        a.    Individual actions are not economically feasible.

        b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

        i.    Damages as provided by statute;

        ii.    Attorney's fees, expenses and costs; and

        iii.    Such other or further relief as is appropriate.

## COUNT II – RICO

89.    Plaintiff incorporates paragraphs 1-78.

90.    This claim is against Chao, who is the RICO "person."

91.    All loans made in the name of "First Loan" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

92.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. §1961(6).

93.     "First Loan" (if it is a real entity) or the Elem Indian Colony of Pomo Indians (if it is not) is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

94.     Defendant Chao is associated with this enterprise.

95.     Defendant Chao conducted or participated in the conduct of the affairs of "First Loan" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

96.     Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

97.     Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

98.     The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "First Loan" at more than 72% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

99.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

100.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.     Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.     Whether "First Loan" is a real entity, perhaps chartered by the Elem Indian Colony of Pomo Indians;

      c.     Whether "First Loan" (if it is a real entity) or the Elem Indian Colony of Pomo Indians (if it is not) is an "enterprise."

      d.     Whether Defendant Chao is associated with "First Loan."

      e.     Whether Defendant Chao conducted or participated in the affairs of "First Loan" through a pattern of making and collecting unlawful loans.

101.    Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

102.    Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

103.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.     Treble damages;

      ii.     Attorney's fees, litigation expenses and costs of suit; and

      iii.     Such other or further relief as the Court deems proper.

*s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.


_s/ Daniel A. Edelman_
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## <u>LIST OF EXHIBITS</u>

A      Loan agreement

B      First Loan's IP Address Server Location

C      Old First Loan website

D      New First Loan website

E      Announcement of Chao presentation at 2017 Native American Financial Association meeting

F      Attempt to enforce First Loan wage assignment

G      Attempt to enforce First Loan wage assignment

H      Washington Department of Financial Institutions notice

I      Second Washington Department of Financial Institutions notice

## <u>NOTICE OF ASSIGNMENT</u>

Please be advised that all rights relating to attorney's fees have been assigned to counsel.


<u>*s/Daniel A. Edelman*</u>
Daniel A. Edelman

Daniel A. Edelman
EDELMAN COMBS LATTURNER
      & GOODWIN, LLC
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## <u>DOCUMENT PRESERVATION DEMAND</u>

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein,  any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very  relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request  that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman